671 S.E.2d 464

**WACO OIL AND GAS COMPANY, INC.,**
**Appellant Below, Appellee**

v.

**Matthew B. CRUM, Director, Division of Mining and Reclamation, and West Virginia Department of Environmental Protection, Appellees Below, Appellants.**

**No. 33829.**

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 23, 2008.

Decided Nov. 14, 2008.

---

Heather A. Connolly, Esq., Thomas L. Clarke, Esq., Office of Legal Services, WV Department of Environmental Protection, Charleston, for Appellee.

Paul E. Parker, II, Esq., Leonard B. Knee, Esq., Anthony P. Tokarz, Esq., Bowles Rice McDavid Graff & Love, Charleston, for Appellant.

STARCHER, J.:[1]

In the instant case we reinstate an order of the West Virginia Surface Mine Board that upheld the denial of a quarry mine permit.

## I.

### Facts & Background

The appellant, the West Virginia Division of Environmental Protection ("DEP"), appeals from a March 21, 2007 order of the Circuit Court of Kanawha County. That order reversed and vacated a January 29, 2003 decision of the West Virginia Surface Mine Board ("Board") that upheld the DEP's denial of a permit to the appellee, Waco Oil and Gas Co., Inc. ("Waco"), to operate a rock quarry in Pocahontas County, West Virginia. (The full text of the Board's January 29, 2003 order is appended to this opinion at Appendix A). Because the Board's order presents a thorough recitation of the underlying facts that led to the instant appeal, we will omit restating those facts in detail.

The circuit court order at issue in the instant case did not challenge the Board's findings of fact; nor does the appellee now contend that the Board's findings were not supported by substantial evidence. In summary, the facts are that beginning in 2000, appellee Waco sought from the DEP a permit to operate a sandstone quarry in a quiet,

1. Pursuant to an administrative order entered on September 11, 2008, the Honorable Thomas E. McHugh, Senior Status Justice, was assigned to sit as a member of the Supreme Court of Appeals of West Virginia commencing September 12, 2008 and continuing until the Chief Justice determines that assistance is no longer necessary, in light of the illness of Justice Joseph P. Albright.

unspoiled, remote, and beautiful geographic area of Pocahontas County—an area where tourism, second homes, and outdoor recreation are a growing and now crucial part of the local economy. For purposes of the instant appeal, it is undisputed and a matter of fact that the appellee's proposed quarrying activities would have caused substantial damage to the present and future well-being of the county, and specifically to local businesses, residents, and visitors.

After an exhaustive administrative review process, the DEP denied the permit application. Appellee Waco appealed that denial to the Board. The Board, after conducting two hearings, issued an order on January 29, 2003 which concluded that the quarrying activity proposed by the appellee would impair and destroy the recreational use and aesthetic values and the future beneficial use of the area in which the quarry was proposed to be located; and found further that the appellee's submissions to the Board and DEP as to how the appellant proposed to avoid the adverse impacts of the proposed quarrying were not credible or persuasive.

The Board additionally rejected the appellee's argument that the appellee's permit application could only be denied if the Board and DEP concluded that no quarrying activity *per se* could ever be conducted in the area in which the appellee proposed to operate its quarry. Rather, the Board concluded that the Board and DEP could make an individual permit application determination based on the merits of an individual permit proposal. The Board refused to rule out the possibility that a quarry permit application in the area might be approved in the future, if it was determined that a proposed quarry operation would not cause unacceptable damage.

Appellee Waco then appealed to the Circuit Court of Kanawha County. In an order dated March 21, 2007, the circuit court held that the Board was wrong in this conclusion. The circuit court held that the appellee's permit application could only be denied if the Board and DEP first concluded that *all* quarrying activity, *per se*, must be banned in the area in which the appellee proposed to operate a quarry. From this conclusion, the DEP appeals to this Court.

## II.

### *Standard of Review*

The circuit court's ruling regarding the Board's action was a matter of pure law that this Court reviews *de novo*. *Tennant v. Callaghan*, 200 W.Va. 756, 490 S.E.2d 845 (1997).

## III.

### *Discussion*

The approval or denial of a quarry permit application is principally governed by two statutes, *W.Va.Code*, 22-4-7 [2000] and *W.Va.Code*, 22-4-8 [2000], which are part of the Quarry Reclamation Act, *W.Va.Code*, 22-4-1 to -29.

The pertinent portion of *W.Va.Code*, 22-4-7 [2000] states:

(a) The director [of the Division of Environmental Protection] may deny a permit application, modification or transfer for one or more of the following reasons:

(1) Any requirement of federal or state environmental law, rule or regulation would be violated by the proposed permit.

(2) The proposed quarry operation will be located in an area in the state which the director finds ineligible for a permit pursuant to section eight [of this Article].

The pertinent portions of *W.Va.Code*, 22-4-8 [2000] state:

The Legislature finds that there are certain areas in the state of West Virginia which are impossible to reclaim either by natural growth or by technological activity and that if quarrying is conducted in these certain areas such operations may naturally cause stream pollution, landslides, the accumulation of stagnant water, flooding, the destruction of land for agricultural purposes, the destruction of aesthetic values, the destruction of recreational areas and future use of the area and surrounding areas, thereby destroying or impairing the health and property rights of others, and in general creating hazards dangerous to life and property so as to constitute an

imminent and inordinate peril to the welfare of the state, and that such areas shall not be mined by the surface-mining process.

Therefore, authority is hereby vested in the director to delete certain areas from all quarrying operations.

No application for a permit shall be approved by the director if there is found on the basis of the information set forth in the application or from information available to the director and made available to the applicant that the requirements of this article or rules hereafter adopted will not be observed or that there is not probable cause to believe that the proposed method of operation, backfilling, grading or reclamation of the affected area can be carried out consistent with the purpose of this article.

If the director finds that the overburden on any part of the area of land described in the application for a permit is such that experience in the state of West Virginia with a similar type of operation upon land with similar overburden shows that one or more of the following conditions cannot feasibly be prevented: (1) Substantial deposition of sediment in stream beds; (2) landslides; or (3) acid-water pollution, the director may delete such part of the land described in the application upon which such overburden exists.

■ Appellee Waco argues that these statutes, read together, require that in order for the DEP to deny a quarry permit application on the grounds that an individual proposed quarrying operation would cause the destruction of aesthetic values and the future beneficial uses of the area in which the operation would be located, there must first be a determination that all quarrying, no matter how conducted, must be barred from the area—in other words, that the area in which the quarry is proposed must be "deleted" from all quarrying activity under the foregoing provisions of *W.Va.Code,* 22–4–8 [2000].

This Court addressed this issue in the case of *Francis O. Day Co. v. Director, DEP,* 191

W.Va. 134, 443 S.E.2d 602 (1994), where the DEP Director denied a quarry permit on the grounds that, *inter alia,* the quarry would have a detrimental effect on the aesthetics and future use of the area in which the quarry was proposed.

In the *Day* opinion, this Court noted that the DEP's "denial of the [quarry] permit was not based on the deletion power[.]" *Id.,* 191 W.Va. at 139, 443 S.E.2d at 607. This Court concluded that the "Director of the DEP retains the authority to refuse to grant a limestone, sandstone or sand surface mining permit based upon any of the criteria found in [the prior enactment of *W.Va.Code,* 22–4–8 [2000]]."[2] *Id.,* 191 W.Va. at 140, 443 S.E.2d at 608. Thus, in the *Day* case, this Court approved an individual quarry permit denial on any of the grounds listed in *W.Va.Code,* 22–4–8 [2000] without the prior exercise of the area deletion powers that are granted to the DEP in that same statute.

*W.Va.Code,* 22–4–8 [2000], quoted *supra,* requires that an application for a permit shall not be approved unless "the proposed method of operation, backfilling, grading or reclamation of the affected area can be carried out consistent with the purpose of [W.Va.Code, 22–4–1 et seq.]". Additionally, an individual permit application may be denied if "any" environmental law would be violated by the proposed operation. *W.Va.Code,* 22–4–7(a)(1) [2000]. *W.Va.Code,* 22–4–17 [2000] requires that an individual permit application, in order to be approved, must show that "all reasonable measures shall be taken to eliminate damages to members of the public[.]"

As previously stated, the appellee argues that if the DEP and Board, when making a decision on an individual permit application, wish to take into account the effects of the proposed quarry on such statutory criteria as the aesthetics and future use of the area surrounding the proposed quarry, these bodies must also make an "area deletion" decision, pursuant to *W.Va.Code,* 22–4–8 [2000],

---

**2.** The 2000 enactment of the Quarry Reclamation Act, *W.Va.Code,* 22–4–1 to –29, created a separate statutory section governing quarries, but included language from earlier statutes that governed quarries and other mining activities.

and must rule that no possible future quarrying may be conducted in the area.

However, *W.Va.Code*, 22–4–8 [2000] also provides that an existing quarry may have its permit modified based on those same criteria, without any requirement that the area in which the quarry is located must be deleted from all possible quarrying activity. Moreover, *W.Va.Code*, 22–4–5(h)(3) [2000] authorizes the denial of an individual permit application for an *underground* quarry, if the quarry will cause "serious adverse environmental impacts [on aesthetics, future use, etc.] pursuant to [*W.Va.Code*, 22–4–7 or –8].".

We cannot conclude from the foregoing statutory language that the Legislature intends that in order to evaluate the suitability of an individual quarry permit for a particular site under the statutory criteria, the DEP must first take on the enormous and inevitably somewhat speculative task of determining whether all future quarrying activity in an area must be categorically banned. Rather, we conclude that a case-by-case permit approval/denial process is what the statutes call for—while reserving the "area deletion power" to the DEP, if the agency chooses to exercise it.[3] This analysis is consistent with our previous decision in the *Francis O. Day Co.* case, *supra*, which the Legislature had before it when it enacted the Quarry Reclamation Act.

## IV.

### Conclusion

■ Accordingly, we hold that under *W.Va.Code*, 22–4–7 [2000] and *W.Va.Code*, 22–4–8 [2000], the West Virginia Division of Environmental Protection and West Virginia Surface Mine Board have the authority to refuse to grant an individual quarry permit based upon any of the criteria identified in those statutes, without having to exercise the area deletion powers that are also granted

3. The briefs do not indicate that this power has ever been exercised.

4. The circuit court also held that the Board was implicitly required to tell the appellant how the

therein. The circuit court's order, reversing the Board's decision, is therefore reversed.[4]

Reversed.

Justice ALBRIGHT not participating.

Senior Status Justice McHUGH, sitting by temporary assignment.

### APPENDIX A

#### Final Order of the West Virginia Surface Mine Board

On October 28, 2002, a quorum of five (5) members of the West Virginia Surface Mine Board ("Board") met with counsel and representatives of the parties at Huntersville, West Virginia and conducted a site visit at locations agreed upon by the parties. On October 29, 2002, a quorum of six (6) members of the Board convened in Marlinton, West Virginia and conducted a hearing in this appeal. At this hearing, the appellant, Waco Oil & Gas Company, Inc. ("Waco"), was represented by Leonard Knee and Eric Calvert of Bowles, Rice, McDavid, Graff & Love and the appellee, West Virginia Department of Environmental Protection ("DEP"), was represented by Thomas Clarke and Perry D. McDaniel of the DEP's Office of Legal Services. At the beginning of the hearing, the Board ruled on Waco's Motion for Judgment on the Record and took up Waco's two motions in limine, as set forth hereinafter. Then, both parties presented opening statements, testimony from witnesses, exhibits and arguments of counsel.

#### I. Waco's Motion For Summary Judgment

DEP denied Waco's application for a permit for quarry mining under the authority of West Virginia Code § 22–4–8 (2000). In its Motion for Judgment on the Record which is equivalent to a Motion For Summary Judgment, Waco argues that under the language of West Virginia Code § 22–4–8, the DEP's authority to deny a quarry permit is limited to circumstances in which reclamation is im-

appellee could modify its permit application to make it acceptable to the Board. We see no authority for such a requirement, implicit or explicit.

possible and, based on the admissions of DEP personnel in discovery that reclamation in accordance with Waco's proposed reclamation plan is possible, it is entitled to summary judgment. In response, DEP's principal argument is that under the statutory language and case law interpreting it, it may deny a quarry permit to avoid certain harms regardless of whether reclamation is possible.

In *Francis O. Day Co., Inc. v. Director, DEP,* 191 W.Va. 134, 443 S.E.2d 602 (1994), the DEP denied an application for a permit for a limestone quarry because it found that the proposed quarry would result in some of the harms listed in the first paragraph of former W.Va.Code § 22–4–10 (1994, c. 61) (superceded in 2000), including a detrimental effect on aesthetics and future use of the area. Because the statute listed these harms following its legislative finding that there may be certain areas of the state where reclamation is impossible and because the law in effect at the time did not require any reclamation of limestone quarries, the permit applicant argued that DEP could not use these harms as reasons to deny its application. The Supreme Court of Appeals rejected this purported connection between the issue of whether reclamation is impossible and the DEP's authority to deny a permit in order to avoid the listed harms. It based its ruling on the second paragraph of W.Va. Code § 22–4–10 (1994, c. 61) which gives the DEP complete authority to prohibit mining wherever necessary to avoid the harms listed in the first paragraph.

For all purposes relevant or material to this case, the language of former W.Va.Code § 22–4–10 (1994, c. 61) is identical to that of current W.Va.Code § 22–4–8. Therefore, the Board concludes that the West Virginia Supreme Court of Appeals' interpretation of this language in *Francis O. Day Co., Inc. v. Director, DEP,* 191 W.Va. 134, 443 S.E.2d 602 (1994) controls this case. As held in the *Day* decision, the second paragraph of W.Va. Code § 22–4–8 gives the DEP authority to deny a quarry permit in order to avoid the harms listed in the first paragraph of this section, regardless of whether Waco's reclamation plan is possible to achieve. By unani-mous vote of the six members of the Board present at the hearing, Waco's motion for summary judgment is denied.

## II. Waco's Motions in Limine

Waco filed two motions in limine. The first of these motions seeks to prohibit the DEP from calling Daniel Terry as a witness. The DEP's pre-hearing disclosures listed Mr. Terry as a potential witness. At the hearing, the DEP informed the Board and Waco that it did not intend to call Mr. Terry, making it unnecessary for the Board to address this motion.

Waco's second motion in limine is based on a fall back position the DEP took in its response to Waco's motion for summary judgment. Although DEP's response admitted that Waco's reclamation plan was physically possible to achieve, it argued that this plan is not practically feasible and urged the Board to place a practical interpretation on the meaning of "impossible" that focused on the practical feasibility of reclamation. The DEP's response identified its engineer, Clarence Wright, as a witness. on the practical feasibility of reclamation according to Waco's plan. Waco's motion in limine on this issue claimed "eleventh hour" surprise and asked that DEP be precluded from presenting evidence on the practical feasibility of Waco's reclamation plan. In the alternative, Waco requested a continuance. Prior to the hearing, the Board denied Waco's motion insofar as it sought a continuance. At the hearing, after hearing the Board's ruling on Waco's motion for summary judgment, the DEP agreed not to present evidence on the issue of the feasibility of Waco's reclamation plan, thereby making it unnecessary for the Board to address Waco's second motion in limine.

## III. Findings of Fact and Conclusions of Law

Upon consideration of the certified record the DEP supplied to the Board pursuant to W.Va.Code § 22B–I–7(e), the Board's observations during its site visit, the testimony heard, exhibits admitted and the arguments of counsel, the Board, by unanimous vote of its six members present at the heating of this matter (Michael, Nay, Cappelli, Hastings, Meadows, and Smosna), makes the following findings of fact and conclusions of law:

## A. Background/Permitting Process

1. On May 25, 2000, Waco submitted an application to the Philippi regional office of the DEP for a permit to conduct quarry mining operations on a 76 acre area on Browns Mountain in Pocahontas County, West Virginia. This application was assigned application number Q-201700 by the DEP.

2. Browns Mountain is part of an anticline which follows a trend from southwest to northeast. It is located just north of Route 39, between Huntersville and Minnehaha Springs, West Virginia. Waco's application seeks to mine the Tuscarora, or White Medina, layer of sandstone. On the area proposed for mining, this layer of sandstone is up to two hundred feet thick and is beneath layers of other types of rock which will have to be removed to gain access to it.

3. Waco acquired its property on Browns Mountain through the efforts of its agent, Hugh Hefner. Through his company, HEFCORP-JON, Hefner acquired an option on the Brown's mountain property in 1999. He obtained title to the property by deed dated May 19, 2000 and leased the property to Waco on May 22, 2000. Subsequently, Hefner transferred the property to Waco by deed dated June 23, 2000. According to this deed, Waco paid HEFCORP-JON $125,000 as the consideration for this property.

4. Mr. Hefner is also a consulting geologist and hydrogeologist. In this capacity, he was responsible for preparation of Waco's permit application.

5. Before it submitted its permit application to the DEP, on May 5, 2000, Waco signed an agreement with West Virginia Paving which anticipates that Waco will obtain a quarry permit on Brown's Mountain and obligates it to transfer this permit and the property associated with it to West Virginia Paving by May 5, 2003. In the event Waco fails to make this transfer, it faces a monetary loss of $1.3 million.

6. Under the same terms of the same agreement, Waco has transferred at least one other active quarry and quarrying permit to West Virginia Paving. In connection with this transfer, the agreement contains a covenant not to complete with West Virginia Paving in the quarry business. Under this covenant, Waco is contractually prohibited from operating a quarry on Browns Mountain. In effect, Waco appears to be acting as an agent for West Virginia Paving for the purpose of acquiring property and a permit for quarrying at the Brown's Mountain location.

7. The DEP received Waco's permit application two weeks before the effective date of the new Quarry Reclamation Act, which the West Virginia Legislature adopted in 2000. An important distinction between this new quarry law and the one previously in effect was that the new law added provisions for reclamation of sandstone quarries and called for the DEP to promulgate regulations on this subject. Necessarily, DEP's consideration of Waco's application was delayed until after those regulations were promulgated. Consideration of Waco's application was also delayed because of a court case over property rights, implementation of new regulations pertaining to anti-degradation under DEP's NPDES permitting program, and the need to redesign and re-designate Waco's spoil storage area. In addition to these unusual delays, the processing of Waco's permit involved the time necessary for DEP to evaluate the application and request that Waco and its consultant supply additional information DEP determined to be necessary to make the application technically complete.

8. After DEP determined the permit application to be technically complete, it was advertised for public comment. During the public comment period on the permit application in January, 2002, DEP received approximately 200 letters, which were unanimous in opposition to the permit. All of these letters were forwarded to both Waco and its consultant for response. On March 4, 2002, a public hearing was held on the permit application. Other than the representatives of Waco and the DEP who were present, all of the people who spoke at the public hearing opposed this permit. The letters protesting the permit and the comments of those who spoke at the public hearing consistently voice concerns over the proposed quarry's impact

on the aesthetics of the area and on property values.

9. After the public hearing, the members of the regional DEP permit team finished their evaluation of the application and prepared their facts and findings and recommendations. Every member of the permit review team: Greg Curry, geologist; Clarence Wright, engineer; Harry Travis, environmental resource specialist; Daniel Lehman, inspector, and Ron Sturm, permit supervisor, recommended denial of the permit upon one or more of the bases for permit denial under W.Va.Code § 22-4-8. Their recommendations were forwarded to the Division of Mining and Reclamation ("DMR") headquarters so a final agency decision could be made.

10. On July 16, 2002, the DEP acting through DMR Director Matthew B. Crum issued a decision denying Waco's application based upon W.Va.Code § 22-4-8. In support of this decision, Director Crum made the following two findings: (1) The location of the proposed quarry, including the noise, blasting, dust, and general unsightliness which are necessarily associated with a stone quarry, will prevent adjacent landowners from the normal use and enjoyment of their properties and will cause a decline in the value of properties adjacent to the quarry site, thereby impairing the property rights of others; (2) The foregoing impacts will result in the destruction of aesthetic values, recreational use and future use of the area and surrounding areas in this especially scenic and tourist-oriented area.

11. Within thirty days of its receipt of the DEP's July 16, 2002 decision, Waco filed an appeal with the Board.

## B. Pocahontas County

12. In addition to the letters opposing the quarry and the comments in opposition to it at the public hearing, the County Commission of Pocahontas County is on record unanimously opposing Waco's permit application. Commission President, Joel Callison explained his reasons for opposing this application. His principal reason for opposing this quarry permit, as Commission President, was protection of the quality of life for the people who live in the area. A secondary reason for opposition is the effect of the quarry on the aesthetics of the area, which impacts tourism in the county. Tourism has been the only business or industry in the county that has grown and shows growth potential for the future. This is because of Pocahontas County's natural beauty and location. Mr. Callison stated that it is not easy for the County Commission to oppose something that may bring jobs to the county, but in this case, it is a question of what is good for the county for the long term versus the short term.

13. In contrast to its position on this permit application, the County Commission supported Waco's application for a new quarry permit at Linwood. Mr. Callison, who was a member of the Commission when it took its position on the Linwood application, explained the differences he saw between that application and the one in this case. The Linwood application involved a site where a quarry had already been in existence for a number of years. By comparison, Browns Mountain is a pristine area. Mr. Callison also explained he supported the DEP's decision on the permit application at the Linwood site, because this decision imposed modifications on the existing permit which placed greater limits the aesthetic impacts of that quarry operation than had existed before. There is no zoning in Pocahontas County.

14. Gail Lowery, Executive Director of the Pocahontas County Tourism Commission testified that Pocahontas County has become one of the most prominent tourist destinations in West Virginia and the eastern United States. It attracts 900,000 visitors per year. These visitors come from all over. In the winter, the largest numbers of visitors come from North Carolina, Florida, Georgia and the South. In the summer, the county's largest tourism markets are Virginia, Ohio, Maryland and West Virginia. State Division of tourism statistics indicate that overnight guests spend an average of $70 per person per night. The estimated annual economic contribution to the Pocahontas County economy from tourism is between $20 and $30 million. This is in contrast to about $1.8 million in logging related dollars paid to Po-

cahontas County. Since 1997, tourism's economic contribution has increased by 19.5% and is projected to increase by 5% per year. As many as 1200 people are directly employed in the county in tourism-related jobs and in total it is estimated that 2000 jobs either directly or indirectly result from tourism.

15. The local tourism bureau in Pocahontas County advertises in 35 to 40 national magazines. The image projected in every one of these ads is a beautiful, pristine outdoor place where one can get away from it all. The pristine beauty of Pocahontas County is also featured in 30 to 40 magazine articles each year. Some examples of magazines which have featured Pocahontas County include; Southern Living, Blue Ridge Country, Country Discoveries, Outdoor Explorer, Birder's World, Bike Midwest, Recreation Moves, Blue Ridge Outdoors, Bike, Bicycling, Fly Fisherman, American Angler, American Motorcyclist, Rider and Canoe and Kayak. Pocahontas County has also been featured as an outdoor recreation mecca in travel articles in quite a few newspapers, including; the Washington Post, the Baltimore Sun, the Mountain Times, the Richmond Times Dispatch, and the Roanoke Times, as well as almost all of the newspapers in West Virginia.

16. While the ski resort at Snowshoe is what many people might associate with tourism in Pocahontas County, the county also draws many people on a year round basis who come to enjoy its scenic beauty, hiking, mountain biking, trout fishing, hunting, outdoor recreation and history. The principal attraction of Pocahontas County for those who enjoy these activities is its quiet, unspoiled atmosphere. Pocahontas County also has more state parks and forests than any other county in West Virginia. Five state parks, two state forests, a large part of the Monongahela National Forest and segments of the Allegheny Trail and the Greenbrier River Trail are in Pocahontas County. The fact that over 60% of Pocahontas County is owned by either the state or federal government has contributed to the preservation of much of the county in an unspoiled natural state.

### C. The Brown's Mountain/Route 39 Area

17. The general area of Route 39 between Huntersville and Minnehaha Springs, including Browns Mountain, is a very special area which is highly valued for its aesthetic attributes. There is no heavy industry. There is no source from which dust is produced by an industrial operation. There is no source from which noise is produced with any regularity. The only disturbance of the natural landscape in the area is from logging. Generally, the places where logging has been done are near the mountain tops in the area and, for the most part, are not visible to the general public from highways in the area. Knapps Creek, which is popular with both local residents and visitors to the area for its trout fishing, flows gently through a break in the anticline at Browns Mountain, along Route 39. Because the air is so clear, many more stars can be seen in the night sky there than in more developed areas. An unusual quiet is pervasive.

18. People have long appreciated the qualities of the area. Robert E. Lee is reported to have written the following from Huntersville in August, 1861:

"The views are magnificent ... the valley is so beautiful, the scenery so peaceful. What a glorious world almighty God has given us. How thankless and ungrateful we are, and how we labor to mar his gifts."

Valley Guide, February/March 2002.

19. Appreciation of the special atmosphere of the area around Brown's Mountain continues in modern times. Route 39 has been honored with special recognition of its scenic and aesthetic attributes. Businesses whose existence is based specifically on the aesthetics and recreational value of the area have been established. Both as visitors and on a more permanent basis as home owners, people from other parts of this country and the world come to this area seeking its aesthetic qualities: qualities that are increasingly rare elsewhere.

20. The segment of Route 39 from the state boundary with Virginia through Pocahontas County to Richwood in Nicholas

County, West Virginia has been designated by the West Virginia Division of Highways as the Mountain Waters Scenic Byway. It has had this status since July 17, 2000. Gail Lowery of the Pocahontas County Convention and Visitors Bureau, who testified before the Board, was active in the efforts to obtain scenic byway status for Route 39 and remains active in efforts to promote the route as a scenic byway. The segment of Route 39 in Virginia, from Interstate 64 west to the state boundary with West Virginia, has had scenic byway status for a number of years. Ms Lowery and her counterparts in Nicholas Counties are seeking scenic byway status for the segment of Rt. 39 from Richwood to U.S. Route 19. An announcement of scenic byway status for this segment is anticipated to be made soon. After this designation is made, the four counties in which Route 39 will have scenic byway status, Bath and Rockbridge Counties in Virginia and Pocahontas and Nicholas Counties in West Virginia, plan to make joint efforts to promote Route 39 and to obtain federal funding for beautification projects and enhancements, such as bike paths, along its route. It is anticipated that the facts that the Mountain Waters Scenic Byway will connect two major traffic arteries and that it will be promoted by two states will help give projects along its route a higher priority in obtaining federal funding.

21. Gordon Josey and his wife own Camp Twin Creeks at Minnehaha Springs. It occupies 127 acres on Route 39, about two miles from the proposed quarry site as the crow flies. Camp Twin Creeks is a children's summer camp. Mr. Josey and his wife purchased this camp about two years ago for $900,000. Since then, they have invested nearly $500,000 in capital to upgrade the facilities at the camp and plan to continue to invest approximately $100,000 per year in the future. In addition to the capital Mr. Josey has invested, he estimates that he spends $50,000 to $60,000 per year in the local economy for materials, supplies and other expenses necessary for the operation of his camp. The Camp also employs three local people on a full-time, year-round basis and twelve additional local people between memorial day and labor day. Including employees from the local area and counselors, many of whom come from outside the area, the Camp employs ninety people at the peak of its operations in the summer.

22. Mr. Josey has experience operating and working at children's summer camps in this country and in Europe. After several years of operating camps owned by others, Mr. Josey decided to purchase his own camp. He looked at six or seven camps in Pennsylvania, upstate New York and Maine before seeing Camp Twin Creeks. When they first entered on the property at Camp Twin Creeks, he and his wife were very impressed with the beauty and unspoiled nature of the area. Mr. Josey says the area is so quiet that dogs can be heard barking at a distance and at night there is only the sound of bullfrogs to keep you awake.

23. Three hundred seventy children attended Camp Twin Creeks in the first year of its operation under Mr. Josey's ownership. Five hundred fifty children attended Camp Twin Creeks last year. Mr. Josey projects that six hundred fifty children will attend his camp in the coming summer. Most of his campers come from Washington, D.C. and Baltimore. Many campers also come from Florida, Atlanta and overseas. According to Mr. Josey, the biggest draw his camp has for campers is the area, because it is so unspoiled and pretty. Because of the Greenbrier, Snowshoe, and the Homestead nearby in Virginia, this area of West Virginia has a wonderful reputation in the metropolitan Washington, D.C. area. Parents who bring their children to Camp Twin Creeks often spend additional time in the area at local bed and breakfasts and enjoy mountain biking and hiking.

24. Jean Dunham has owned and operated the Carriage House Inn bed and breakfast on Route 39 in Huntersville for about ten years. She purchased the Carriage House Inn after she decided to move to West Virginia from California to escape the pollution, overgrowth and earthquakes there.

25. The Carriage House Inn is about a mile from the proposed quarry site. It has five rooms and a suite, each of which has its own bathroom. It is in a house that was

built in 1852 and which served as a makeshift hospital during the Civil War. In addition to the Inn, she also has two gift shops on the premises. Both sell crafts made by over one hundred twenty area artisans. Ms. Dunham has invested approximately $ 250,000.00 in capital in her property and business. Her bank recently valued the business at $450,000. She spends $35,000.00 per year on operating expenses, 80% of which is spent locally.

25 [sic]. Attributes which draw guests to the Carriage House Inn are the scenic beauty and aesthetics of the area. Guests enjoy sitting outside by the raised bed gardens or on the porches, enjoying the wildlife of the area and the quiet that is interrupted only by the sound of bullfrogs. According to Ms. Dunham, it sometimes so quiet that she can hear the sounds neighbors make over a mile away. Activities her guests enjoy in the area include fishing, hiking, hunting, and mountain biking.

26. Most of the guests come to the Carriage House Inn from the Washington, D.C. area, New York, the Carolinas, Florida and Colorado. Some guests come from as far away as Australia, New Zealand and Europe. About two weeks before the Board's hearing in this case, Ms. Dunham hosted a reporter from Germany who was writing about West Virginia for a travel publication in that country. According to this reporter, the area around the Carriage House was his favorite area of the state. In the past year, after the terrorist attacks on the World Trade Center and the Pentagon on September 11, 2001, Ms. Dunham has had a number of guests from those areas who sought refuge in the quiet beauty of the Huntersville area. Ms. Dunham promotes the Carriage House in magazines, newspapers and on a web site. The Carriage House has received favorable reviews in a number of travel books and articles. Ms. Dunham brought a stack of such publications that was about a foot high with her when she testified before the Board. Out of these, she identified the coverage her inn had received in National Geographic's Hidden Corners of the United States as the one of which she is most proud.

27. Don Nordstrom and his wife operate the Ambassadors For Christ Retreat near Huntersville. It is about a half mile from the site of the proposed quarry. Ambassadors For Christ Retreat is a non-profit, non-denominational Christian retreat. It has been operating for over thirty years and is capable of housing 120 persons. Its accommodations include motel-type rooms, cabins, bunkhouses, RV hookups and campsites for tents. A meeting facility is available for groups to hold programs, seminars and classes. The Retreat hosts 2,200 to 2,400 guests each year. There is an upward trend in the number of people who come to the Retreat as guests. In the first nine months of 2002, the hotel/motel tax collected on what guests pay for lodging at the Retreat exceeded what was collected for all of 2001.

29 [sic]. People are attracted to the Retreat by the peace and quiet and natural beauty of the place. As soon as they arrive, first-time guests note the natural beauty. Shortly thereafter, they notice how quiet it is. The quiet of the night, itself, is an attraction with nothing but the sound of bullfrogs, whippoorwills and the water of the creek that flows through the Retreat, bubbling by. According to Mr. Nordstrom, "with the windows open in the summer, it's better than a sleeping pill." Guests at the retreat usually schedule free time so they can get out and enjoy the outdoor recreational opportunities and activities that are available in the area.

30. The homes and property in the area closest to the proposed quarry and which, therefore, will be affected most by it are located on Browns Mountain Road and in Possum Hollow. Browns Mountain Road begins at its intersection with Route 39 and from there runs upward initially along a flank of Brown's Mountain and then on to the top of the mountain Residents of this area are a mix of people from one of two backgrounds, those who have purchased second homes or retirement homes there and those who are the current generation of families which have lived in this area for many generations. There are a total of thirteen homes on Brown's Mountain Road. Seven of these homes are owned by full time residents of Brown's Mountain and the rest of the homes

are second homes or retirement homes. The people who own the second homes or retirement homes are from Louisiana, Florida, Maryland, Ohio, and West Virginia.

31. Norman Wolcott and his wife have owned property on Browns Mountain Road near the top of the mountain where their second home is located. Their home is 1.2 miles from Route 39 and about three fourths of a mile from the proposed quarry. They spend approximately three to six months per year there, during all four seasons. Over the years they have owned property on Browns Mountain, the Wolcotts have invested $50,000 to $60,000 there.

32. The Wolcotts' principal residence is in Rockville, Maryland. Rockville is a congested, noisy suburb of Washington, D.C. At Brown's Mountain, they sought a place to get away from city life. Dr. Wolcott initially learned of the Brown's Mountain area and was attracted to it by the descriptions of the natural beauty there he heard from a friend of his in the military service who had flown over the area many times and described it as the most beautiful country on the eastern seaboard. The Wolcotts visited the area several times before buying their property there. What they found in the area was a place of absolute quiet, free of pollution and full of wildlife. In the clear air, many more stars can be seen than in urban areas like Rockville.

33. Possum Hollow is immediately to the east or southeast of Brown's Mountain and Brown's Mountain Road, along Route 39. The proposed quarry on the side of Browns Mountain would face the four homes in Possum Hollow. All four of these homes are owned by persons who have descended from the Howsare family, which has lived in Possum Hollow for at least four generations. One of the homes, the Howsare family home place, is owned by Margie Howsare and her husband. Ms. Howsare bought the family home place from her brother for $22,500 in 1990. She and her husband have spent approximately $60,000 in upgrades since then. According to a bank's appraisal earlier this year, this home is now valued at $95,000. The family home place faces the side of

Brown's Mountain which Waco proposes to quarry.

34. Ms. Howsare has lived all of her thirty six years, except for a three to four year period, in Possum Hollow. During the time she was away from Possum Hollow, she lived in very populated areas. Until that time, she didn't realize how quiet and peaceful it is in Possum Hollow or that such an atmosphere is quite rare.

### D. Waco's Application

35. The permit application meets all of the technical requirements of the Quarry Reclamation Act. Waco also made some effort in an attempt to reduce the aesthetic impact of the proposed quarry. These measures included locating the quarry on the east side of Brown's Mountain, thus limiting visibility from the west; locating the quarry in the wind shadow of Browns Mountain and the hollow created by Evans Branch to mitigate dust and noise propagation; limiting the size of the cuts to limit the amount of exposed material; and providing for contemporaneous reclamation and revegetation of the quarry site, with complete highwall elimination, to limit the amount of exposed highwall during the active mining operations at the quarry.

36. Waco complains that they were not aware that the DEP was going to use impact on aesthetics as a basis for permit denial, and that they were therefore not given an opportunity to address DEP's concerns with aesthetics prior to permit denial. However, Waco was given an opportunity to address these concerns during the *de novo* hearing before the Surface Mine Board.

37. The proposed quarry operation would significantly impair the aesthetic values of the Brown's Mountain area, The haul road from the quarry will enter Rt. 39 almost directly across Knapps Creek from the Devils Backbone, a well known geologic feature, and adjacent to a popular trout fishing hole in Knapps Creek. The highwall created during the active mining will be plainly visible to west bound travelers on Rt. 39. The scenic values of this stretch of Rt. 39 and Knapps Creek are substantial and would be difficult to overstate. The development of a quarry in this area will destroy these values, which

form the basis of the tourist industry in Pocahontas County.

### E. Conclusion

38. Part of the DEP's basis for denying Waco's application is its finding that the quarry would cause "destruction of aesthetic values, recreational use and future use of the area and surrounding areas". July 16, 2002 denial letter. The Board upholds DEP's decision to deny the application on this basis. The Board does not uphold DEP's denial decision on the basis of decrease in property values.

39. The Board was very impressed by the testimony of County Commission President Joel Callison and Gail Lowery of the Pocahontas County Convention and Visitors Bureau. Tourism is an industry that has been developed in this area. It is a big industry. It is based upon the recreational values of this area. It is based upon the aesthetic values, specifically, of the Brown's Mountain area. This is supported by the testimony regarding the scenic byway, as well as other evidence before the Board. The Board concludes that the area where the permit is proposed by Waco's application is a very special area. Because the Board believes that this is such a special area, it is clear that the impact of this quarry, as proposed and presented, will be sufficient to impair and destroy the recreational use and the future use of the area, as well as the aesthetic values of the area.

40. The Board finds, as a general matter, that the testimony of Waco's permitting consultant, Mr. Hefner, was not wholly credible. Certainly, the Board finds that his testimony was not credible on the noise issue. Also, his testimony about the contemporaneous regrading of highwalls was not credible, as pointed out in the testimony of Clarence Wright.

41. The Board heard contradictory evidence about the extent of the noise, blasting, dust, traffic and general unsightliness that will result from the quarry Waco proposes. Because the Board believes that it is sufficiently clear that the quarry as proposed and presented will, in any event, impair and de-

stroy the recreational use and the future use of the area as well as aesthetic values, the Board does not believe it is necessary to make specific findings and conclusions as to the precise extent of noise, blasting, dust, traffic and general unsightliness in terms of decibels of noise, numbers of blasts, number of disturbed acres, or traffic count.

42. As in the case of the testimony of Mr. Hefner, the Board finds that the testimony of the real estate appraiser, Mr. Pratt, was not wholly credible. Specifically, his opinion that the value of the improvements to real estate in the area of the quarry would decrease to zero over a period often years was simply unbelievable.

43. The statute, West Virginia Code § 22–4–8, specifically allows denial of a permit if there is an impairment of property rights of others. However; in no way does the Board base this decision on decrease in property values. It recognizes that there may be a decrease in the property values of some of the neighbors of this quarry if it is allowed to operate, but that is going to be true in the case of every quarry permit anywhere in the state. The Board does not think that is sufficient reason to deny this permit or any permit. There has to be a broader impact on property values than just the effect on the neighboring properties or those in the backyard of the quarry.

44. The Board heard argument, and some evidence, about the role of public sentiment in this permit decision. The Board's decision is not based in any way on public sentiment. The Board did consider the testimony from the citizens in terms of the substantive comments they made or points they made. It believes Director Crum analyzed this issue properly: you don't count the number of people to make a decision, but you do listen to what they are saying and consider whether there is any basis for their comments.

45. One other thing the Board wants to be clear about is that it is not in any way saying there can't be a quarry in Pocahontas County, nor is it saying there can't be a quarry in this general area. The Board is not even saying there can't be a quarry on Brown's Mountain. The Board is just saying that the quarry, as proposed, will have too

great of an impact on the tourism industry and the aesthetic values of the area. Therefore, this permit should be denied.

46. The decision of the Board is without prejudice. The company has the right to reapply for a quarry permit at that location if it feels that there is some way to address the concerns specified by DEP and also by this Board in its decision. By this decision, the Board does not intend to delete this area from all consideration as a quarry site.

47. Waco has made much of the fact that after its application became technically complete, DEP did not advise it that a decision to deny the permit might be made, based on concerns raised by the citizens' comments and protests. Under such circumstances, and whenever possible, the Board encourages the DEP to let a permit applicant know that permit denial is a possibility so that either: the applicant can address the possible reasons for denial; or, the applicant will not spend money uselessly responding to requests for permit corrections when the permit will be denied in any event.

### IV. Motion to Reconsider

48. After the Board announced its decision at the hearing in this matter, the Appellant filed a Motion to Reconsider and for Specific Relief. The DEP filed a Response to this Motion, and the Appellant filed a Reply to the Response. The Motion to Reconsider was considered by Board members Michael, Nay, Hastings and Cappelli on January 22, 2003. Members Meadows and Smosna were contacted by phone by the Chairman of the Board on January 27, 2003.

49. The Motion argues that the decision of the Board violates the new Quarry Reclamation Act, because that Act only allows denial of a permit for three reasons, none of which encompass the Board's rationale in this case.

50. The Board concludes that the second reason for permit denial, as set forth in the new law at § 22-4-7, authorizes the denial of the permit in this case. That section allows denial of a permit if "the proposed quarry operation will be located in an area in the state which the director finds ineligible for a permit pursuant to section eight (22-4-8)."

51. The Board agrees with the DEP that § 22-4-8 allows an individual permit to be denied for any of the reasons in that section, even if the area is not permanently declared off limits to quarrying. In this particular case, the Waco application was denied not only because the proposed quarry is located in a special area, but also because this specific application proposes a quarrying method which will substantially impair the aesthetic values and future recreational uses of the area. A future application for quarrying in this area could conceivably propose a method of quarrying which does not cause these negative impacts.

52. The Board's interpretation of the meaning of § 22-4-8 is consistent with the way in which the former § 22-4-10 (which is essentially identical) was interpreted by the West Virginia Supreme Court of Appeals in the *Day* case, discussed above. That is, the DEP has the authority to deny an individual quarry permit for any of the criteria contained in § 22-4-8. As in the *Day* case itself, this authority can be exercised to deny a particular permit, without deleting the area from all future quarrying.

53. The Board will presume that the Legislature was aware of the *Day* case, and the Supreme Court's interpretation of the former § 22-4-10, when it reenacted this section as the new § 22-4-8. "(I)t being presumed that the legislators who drafted and passed it were familiar with all existing law, applicable to the subject matter, whether constitutional, statutory or common, and intended the statute to harmonize completely with the same". *Hudok v. Board of Educ. of Randolph County*, 187 W.Va. 93, 415 S.E.2d 897, 899–900 (1992). The Board does not believe that the language in the current § 22-4-7 implicitly overrules the *Day* case.

54. Accordingly, by unanimous vote of the six members who considered it, the Motion to Reconsider is Denied.

WHEREFORE, the Board, by unanimous vote of six of its members present at the hearing of this matter, (Michael, Nay, Cappelli, Hastings, Meadows and Smosna), AF-

FIRMS the DEP's decision to deny Waco's permit application.

ENTERED this 29th day of January, 2003